COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Frank and Humphreys
Argued at Chesapeake, Virginia


STURGIS L. KIDDER
                                        OPINION BY
v.    Record No. 2092-01-1           JUDGE LARRY G. ELDER
                                        MARCH 26, 2002
VIRGINIA BIRTH-RELATED NEUROLOGICAL
 INJURY COMPENSATION PROGRAM


          FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

          Cheryl S. Thomas for appellant.

          John J. Beall, Jr., Senior Assistant Attorney
          General (Randolph A. Beales, Attorney
          General; Frank S. Ferguson, Chief Deputy
          Attorney General, on brief), for appellee.


     Sturgis Kidder, who sues as father and next friend of

Andrew Patrick Kidder (Andrew or claimant), an infant, appeals a

decision of the Workers' Compensation Commission (the

commission) denying him benefits under the Virginia

Birth-Related Neurological Injury Compensation Act (the Act),

Code §§ 38.2-5000 to 38.2-5021.  On appeal, claimant contends

that the time limit for the filing of a response to his petition

by the Virginia Birth-Related Neurological Injury Compensation

Program (the program) was jurisdictional and, therefore, that

the commission's consideration of the program's late response,

amended late response and accompanying expert medical opinions

was erroneous.  Claimant also contends that even if the

commission had the authority to permit these late filings, the deputy commissioner exceeded her authority by permitting these late filings without an express delegation of authority from the commission. Lastly, claimant contends the commission erroneously concluded he failed to prove his injuries were caused by a deprivation of oxygen, which was necessary to entitle him to the Code § 38.2-5008(A) presumption and further erred in finding, even if he did prove such a deprivation, that the program rebutted the presumption.

We hold the deputy commissioner and commission did not abuse their discretion in accepting and considering the program's late response and medical evidence. We also hold credible evidence supports the commission's conclusion that claimant failed to prove an injury caused by oxygen deprivation. Thus, we affirm the commission's denial of benefits.

I.

BACKGROUND

On February 28, 1990, Dr. Morris M. Elstein delivered Andrew by emergency cesarean section at Virginia Beach General Hospital when Andrew's mother's uterus ruptured during labor. Although a fetal heart monitor was used to follow Andrew's condition during his mother's labor, it was disconnected to permit the cesarean section. Andrew was delivered about twenty minutes later. Although the rupture of Andrew's mother's uterus

caused her to hemorrhage prior to Andrew's delivery, Dr. Elstein found no evidence of placental abruption, and Andrew received an APGAR score of 9 at both one and five minutes after birth. He received the highest available score, a two, for each of the categories of heart rate, respiratory effort, muscle tone, and reflex irritability. He received a score of one in the color category, and the nursery notes indicate he was "pale but otherwise in satis[factory] condition." No abnormalities other than mild jaundice were observed during his stay, and he was discharged when he was four days old.

When Andrew was approximately ten days old, he was readmitted to the hospital due to dehydration. On March 11, 1990, Andrew exhibited a bulging anterior fontanel and experienced seizures. An MRI and various other tests revealed venous sinus thrombosis with resultant cortical thrombosis and deep left thalamic hemorrhage. The parties agree that Andrew is motorically, cognitively and developmentally disabled as a result of the thrombosis but disagree as to the cause of the thrombosis.

At the time of Andrew's birth, the Act required that both the delivering physician and the hospital in which the delivery occurred must "participate" in the Program, as that term is defined in Code § 38.2-5001, in order for a claimant otherwise meeting the Act's criteria to receive assistance from the

- 3 -

Virginia Birth-Related Neurological Injury Compensation Fund (the fund). It is undisputed that, at the time of Andrew's birth, Virginia Beach General Hospital was a participating hospital but Dr. Elstein was not a participating physician.

On January 7, 2000, Andrew's father filed with the commission a petition for benefits under the Act. The Clerk of the Commission issued a "Notice of Claim" on January 10, 2000, directing that the claim be served on the program by hand.

By letter dated February 17, 2000, the program, by counsel, filed a response to the petition. Counsel admitted that, under Code § 38.2-5004(D), the program's response "arguably" was due February 9, 2000. Counsel represented that he had not received the file from the program until January 18, 2000 and that inclement weather had caused multiple office closures, and "[t]o the extent necessary, [he] ask[ed] leave to file this Response to Petition." Also, he moved to dismiss the petition on the ground that claimant was not entitled to benefits because the version of Code §§ 38.2-5008 and -5009 in effect when Andrew was born required that both the hospital and the delivering physician be "participating" in the program and Andrew's physician was not, in fact, participating. Although a 1990 statutory change permitted an award of benefits if either the hospital or the physician was participating, counsel for the program asserted that this change applied only to births

- 4 -

occurring on or after its effective date of July 1, 1990, and, thus, did not apply to claimant's claim. As a result, he contended, claimant could not have been prejudiced by the program's late response.

Claimant responded that the program's response was time-barred. In the alternative, claimant argued that excluding him from the coverage of the Act based solely on the date of his birth would deprive him of due process and equal protection.

By letter dated March 24, 2000, Deputy Commissioner Colville, acting for "the Commission," "grant[ed] permission to the Program to file its response more than thirty days beyond the filing [of the original claim]." She asked the parties to advise her within ten days whether the issue required testimony or could be resolved by submitting the case "on the record." By letter of March 27, 2000, counsel for the program notified Commissioner Colville that the General Assembly was considering a bill which would make retroactive the 1990 statutory amendment permitting recovery of benefits by a claimant when either the hospital or the delivering physician participated in the program rather than requiring that both be participants. The program indicated it did not oppose the statutory change and that if the change passed, the program "will seek leave to respond to the merits" of claimant's petition.

By letter dated April 26, 2000, the program notified Commissioner Colville that the amendment had passed and was to take effect July 1, 2000. The program conceded that dismissal of claimant's petition on procedural grounds no longer was appropriate. Noting it had not obtained an expert opinion before it filed its initial response, the program requested additional time to file an amended response to the petition "on the merits medically." By letter of May 4, 2000, the commissioner gave the program until June 5, 2000, to file its response and indicated that the case would not be set for hearing prior to July 1, 2000, the effective date of the legislation.

On June 5, 2000, the program filed an amended response, including the medical opinion of Donald A. Taylor, a pediatric neurologist. Claimant contended the program was barred from presenting evidence on the merits because it failed in its initial response to reserve the right to supplement or seek expert medical evidence, and claimant moved to strike the program's amended response. The deputy commissioner denied the motion.

Both claimant and the program submitted additional medical evidence, which included clarifications of medical opinions already given. Dr. Edward H. Karotkin reviewed the medical records on Andrew's behalf, and Drs. Kathryn Kerkering and

Lawrence D. Morton reviewed the records on the program's behalf. The record also included the opinion from a panel comprising Drs. William N.P. Herbert, James E. Ferguson and Elizabeth Mandell pursuant to Code § 38.2-5008(B).

Following a hearing, Deputy Commissioner Colville issued an opinion denying benefits. She concluded claimant was not entitled to the Code § 38.2-5008(A) presumption because "the weight of the evidence established that the infant's condition was not caused by oxygen deprivation." In the alternative, she concluded that even if the presumption did apply, "the weight of the medical evidence rebuts the presumption [by establishing] that dehydration, a known cause for the thrombosis sustained by the infant, was the cause of his condition."

Claimant filed a request for review, arguing that the program's response to its original petition was time-barred because the response was not filed within thirty days of service of the petition and the program did not seek leave to file a late response before the thirty days had expired. Claimant also argued that the program's response and all medical evidence submitted thereafter was inadmissible because the program failed to reserve the right to supplement its initial response or to seek expert review of the medical records, stating instead that "the records speak for themselves." Next, claimant argued the commissioner erred in concluding that the injury was caused by

- 7 -

dehydration rather than oxygen deprivation during delivery. Finally, claimant argued that the program failed to present sufficient evidence to overcome the rebuttable presumption of Code § 38.2-5008(A).

With one commissioner dissenting, the commission affirmed the deputy's denial of benefits. Claimant noted this appeal.

II.

ANALYSIS

A.

PROGRAM'S LATE FILING OF RESPONSE TO PETITION
AND MEDICAL EVIDENCE

The Act authorizes the commission "to hear and pass upon all claims filed pursuant to this [Act]" and to "exercise the power and authority granted to [the commission] in Chapter 2 of Title 65.2 [the Workers' Compensation Act] as necessary to carry out the purposes of this chapter." Code § 38.2-5003.

> Upon receipt of [a] petition [for benefits under the Act,] the Commission shall immediately serve the Program by service upon the [designated] agent . . . by registered or certified mail . . . . The Program shall have thirty days from the date of service in which to file a response to the petition, and to submit relevant written information relating to the issue of whether the injury alleged is a birth-related neurological injury, within the meaning of this chapter.

Code § 38.2-5004(A)(2), (D).

Claimant's petition was served on the program on January 10, 2000, making the program's response due on or before February 9, 2000. Although the program did not file its response until February 17, 2000, it acknowledged the lateness of its filing and sought the commission's permission to file the response. We agree with the commission's holding that it had the authority to permit filing of the late response under Rule 1:9 of the Rules of the Supreme Court, which provides as follows: "The time allowed for filing pleadings may be extended by the court in its discretion and such extension may be granted although the time fixed already has expired . . . ."[1] Although the Rules of the Supreme Court do not expressly apply to the commission, we previously have applied them in interpreting the powers available to the commission under Chapter 2 of the Workers' Compensation Act. See Jeff Coal, Inc. v. Phillips, 16 Va. App. 271, 277-78, 430 S.E.2d 712, 716-17 (1993) (holding that this Court, in analyzing power of commission to punish for contempt or disobedience of its orders as authorized by

---

[1] The commission cited Rule 1 rather than Rule 1:9, but its recitation of the content of the rule makes clear that it referred to Rule 1:9.

The commission's statement that it "must consider the legal and factual questions presented and issue a determination" "[e]ven if [claimant] is correct and the Deputy Commissioner erred by allowing the Response and Amended Response," was an alternative holding to be followed only if we were to conclude that the commission lacked the authority to extend the program's time for filing its response.

§ 65.2-202(A), which grants to commission same authority given to courts and judges by specified code sections, may "look to the authority [Rule 4:12] vest[s] in the courts and judges to punish for disobedience of their orders").

Our examination of the statutory scheme also provides no indication the legislature intended that the program's failure strictly to comply with the thirty-day response period set out in Code § 38.2-5003(D) would require exclusion of the program's response or medical evidence. Although that code section provides that "[t]he Program shall have thirty days" to file its response, the Supreme Court has held "repeated[ly] . . . that the use of 'shall,' in a statute requiring action by a public official, is directory and not mandatory unless the statute manifests a contrary intent." Jamborsky v. Baskins, 247 Va. 506, 511, 442 S.E.2d 636, 638 (1994). In the absence of evidence that the legislature had a contrary intent, timely filing is not jurisdictional.

These same principles apply here because the program is (1) created by state statute, Code § 38.2-5002(A); (2) funded by a public trust comprising voluntary and involuntary assessments and reviewed for solvency by the State Corporation Commission, Code §§ 38.2-5015, -5020, -5021; and (3) administered by a board of directors appointed by the Governor, Code §§ 38.2-5015,

-5016.  Thus, actions of the program are actions of a public official.

Further, Code § 38.2-5003(D) is silent as to the consequences of the program's failure to file a response within thirty days.  In contrast, Code § 38.2-5013 provides, with certain exceptions not applicable here, that "[a]ny claim under this chapter that is filed more than ten years after the birth of an infant alleged to have a birth-related neurological injury is barred . . . ."  Thus, the legislature clearly demonstrated its ability to prevent the commission from considering certain late filings and chose not to impose such a bar in the case of a late filing from the program.  Also, as the commission found, the statutory scheme makes clear that even if the program failed to file any response at all, the commission would remain charged with the duty of examining the evidence before it, including the opinion of the panel of physicians required under Code § 38.2-5008(B).[2]

_____

[2] Code § 38.2-5008(B) provides as follows:

> The deans of the medical schools of the Commonwealth shall develop a plan whereby each claim filed with the Commission is reviewed by a panel of three qualified and impartial physicians.  This panel shall file its report and recommendations as to whether the injury alleged is a birth-related neurological injury as defined [by the Act] with the Commission at least ten days prior to the date set for hearing . . . .  The

- 11 -

The Supreme Court has recognized that the failure of a public official to act in a timely fashion, although not jurisdictional, may nevertheless require corrective action, such as exclusion of a document or dismissal of an action, if the party complaining of the untimeliness suffered prejudice amounting to a due process violation.  See, e.g., Tran v. Bd. of Zoning Appeals, 260 Va. 654, 657-58, 536 S.E.2d 913, 915-16 (2000).  Claimant contends that allowing the program's late filing prejudiced him, but he does not explain in what way he was prejudiced.  The only prejudice we ascertain comes from the six-month delay in resolving claimant's entitlement to benefits from the fund.  However, claimant's father waited until claimant was almost ten years old to file the petition for benefits.  Further, the delay in the commission's consideration of the petition on the merits did not result from the absence of the program's medical evidence; rather, it resulted from the fact that the Act as it existed when the petition originally was filed did not entitle claimant to benefits because he did not meet the Act's jurisdictional requirements.  By the time the amendments to the Act took effect, the program had submitted its primary medical evidence.  Thus, we perceive no prejudice to claimant from the late filing of the program's medical evidence,

---

Commission must consider, but shall not be
bound by, the recommendation of the panel.

and we hold that the commission's allowing the late filing did not violate due process.

Citing Code § 65.2-203, claimant nevertheless contends the deputy commissioner lacked authority to grant the requested extension absent an order from the commission expressly delegating such authority. We disagree. Code § 65.2-203(A) provides that

> Deputy commissioners shall have the power to subpoena witnesses, administer oaths, take testimony and hear the parties at issue and their representatives and witnesses, decide the issues in a summary manner, and make an award carrying out the decision. Deputies may exercise other powers and perform any duties of the Commission delegated to them by the Commission.

That code section provides deputy commissioners with the authority to try cases within the jurisdiction of the commission and to resolve, in the first instance, all disputes between the parties related to those cases. Implicit in the deputies' specifically enumerated duties, therefore, is the power to extend nonjurisdictional filing deadlines and to grant continuances. Accordingly, the deputy commissioner had the authority to allow the program's late-filed response.

Even if we were to hold that Code § 65.2-203 required a delegation of authority from the commission before the deputy had authority to accept the late filing, we would not reach a different result. Code § 65.2-203 does not require that a

- 13 -

delegation of duties to a deputy commissioner be express or direct.[3]  The commission, by practice, has approved the delegation to its deputy commissioners of duties not expressly authorized by statute, rule or prior order of the commission. See, e.g., Tyler v. John J. McMullen & Assocs., No. 194-42-95, 2000 WL 1518045 (Va. Workers' Comp. Comm'n July 6, 2000) (implicitly approving deputy's authority to award attorney's fees to claimant's former attorney); Brummell v. Chase City Pub. Works, No. 179-66-43, 1998 WL 1003871 (Va. Workers' Comp. Comm'n Aug. 31, 1998) (implicitly approving chief deputy commissioner's authority to strike response filed by employer after claimant filed request for review of deputy commissioner's decision and claimant and employer had each submitted written statements under Commission Rule 3.2); Johnson v. Seasons Greetings, Inc., No. 143-33-14, 1996 WL 1075288 (Va. Workers' Comp. Comm'n Mar. 4, 1996) (implicitly approving deputy's authority to approve compromise settlement).  An order of the commission expressly

---

[3] We are not bound by prior unpublished decisions of this Court.  See Fairfax County Sch. Bd. v. Rose, 29 Va. App. 32, 39 n.3, 509 S.E.2d 525, 528 n.3 (1999) (en banc).  Further, the unpublished decision claimant cites, Smith v. Weber, No. 0873-85, 1986 WL 403945 (Va. Ct. App. Nov. 5, 1986), held only that Code § 65.1-12, the predecessor to Code § 65.2-203, permitted the commission to delegate duties to the deputy commissioners.  Although the delegation which occurred in Smith involved an express statement in an opinion of the commission, we did not hold that Code § 65.1-12 required that any delegation must be express.

delegating such authority prior to a deputy's exercise of that authority is not required.

Claimant nevertheless contends that the program's failure to file any medical evidence with its response and its failure expressly to reserve the right to do so at a later time prevented the commission from considering the program's subsequently filed medical evidence. Again, we disagree.

Rule 1:8 provides that pleadings may be amended by leave of court and that "[l]eave to amend shall be liberally granted in furtherance of the ends of justice." The Supreme Court has held that a court abuses its discretion in refusing to allow an amendment where nothing in the record suggests the amendment will result in prejudice to the opposing party. See Kole v. City of Chesapeake, 247 Va. 51, 57, 439 S.E.2d 405, 409 (1994). Claimant cites no authority which would require the program to reserve the right to supplement its petition, and we see no benefit to be derived from applying such a rule here.

The program's initial response requested a dismissal of claimant's petition on jurisdictional grounds, grounds which did not require medical evidence to support them. The program alleged that claimant was not eligible for benefits from the fund because the physician who delivered him was not a physician "participating" in the program on February 28, 1990, the date claimant was born. Claimant did not dispute this fact and

- 15 -

opposed the motion only on the ground that dismissal of his petition for this reason would violate due process and equal protection.

The program then notified claimant and the commission that the legislature was considering a statutory amendment, supported by the program, which would entitle claimant--and any other children born before July 1, 1990, who would otherwise be eligible--to seek benefits from the fund even though both the delivering doctor and delivering hospital were not participating members of the program at the time of the delivery. Not until this amendment to the statute was passed did claimant have a basis for seeking benefits from the fund. For the reasons already discussed, we conclude claimant suffered no prejudice from this delayed filing, and we hold that the commission's allowing the late filing was not an abuse of discretion.[4]

B.

PROOF OF INJURY CAUSED BY OXYGEN DEPRIVATION

Claimant contends the commission erroneously concluded he was not entitled to the Code § 38.2-5008 presumption because he failed to prove his injuries resulted from oxygen deprivation. We hold the record contained credible evidence to support the

---

[4] The commission ruled for other reasons that it would not consider Dr. Duncan C. MacIvor's testimony or written opinion. Neither party appealed this decision. Thus, we also do not consider Dr. MacIvor's testimony or written opinion.

- 16 -

commission's finding that claimant's injury resulted from venous sinus thrombosis which was caused by dehydration occurring after his release from the hospital rather than by oxygen deprivation or asphyxia occurring when his mother's uterus ruptured during delivery.

The Act establishes a framework to provide monetary relief to claimants who have sustained a "[b]irth-related neurological injury," which is defined as

> injury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled . . . [and which] disability cause[s] the infant to be permanently in need of assistance in all activities of daily living.

Code § 38.2-5001. The legislature, recognizing the difficulty in proving when such an injury was sustained, enacted a presumption to assist potential claimants in obtaining benefits. Code § 38.2-5008(A)(1). Code § 38.2-5008(A)(1) provides, in pertinent part, as follows:

> A rebuttable presumption shall arise that the injury alleged is a birth-related neurological injury <u>where it has been demonstrated, to the satisfaction of the Virginia Workers' Compensation Commission, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation</u> or mechanical injury, and that

- 17 -

the infant was thereby rendered permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled.

If either party disagrees with such presumption, that party shall have the burden of proving that the injuries alleged are not birth-related neurological injuries within the meaning of the chapter.

(Emphasis added).  Before the Code § 38.2-5008 presumption that an injury is birth-related comes into play, a claimant must prove that his injury was to the brain or spinal cord and that it was caused by oxygen deprivation or mechanical injury.  Here, claimant does not allege that his disability resulted from mechanical injury.  Thus, we consider only whether the evidence was sufficient to support the commission's finding that claimant failed to prove his injury was caused by oxygen deprivation.

Claimant bore the burden of proving by a preponderance of the evidence that he suffered an oxygen deprivation.  That evidence must establish a probability of oxygen deprivation, not merely a possibility.  See, e.g., Fairfax Hosp. Sys. v. Curtis, 249 Va. 531, 535, 457 S.E.2d 66, 69 (1995).  As with any medical question before the commission,

"[m]edical evidence is not necessarily conclusive, but is subject to the commission's consideration and weighing." Hungerford Mech. Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 214 (1991). . . .  "Questions raised by conflicting medical opinions must be decided by the commission." Penley v. Island Creek

- 18 -

Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989). . . . "The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

Virginia Birth-Related Neurological Injury Comp. Pgm. v. Young, 34 Va. App. 306, 318, 541 S.E.2d 298, 304 (2001).

On this record, we find credible evidence to support the commission's decision. All medical experts agreed that claimant's "neurological deficit was a result of a venous sinus thrombosis" which "became manifest by seizures at 10 days of age." Although they disagreed as to the cause of that thrombosis, credible evidence established it was caused by dehydration occurring after claimant's initial release from the hospital rather than by asphyxia "occurring in the course of labor, delivery or resuscitation in the immediate post-delivery period."

Claimant's only medical expert to offer an opinion in claimant's action for benefits from the fund, Dr. Karotkin, opined that the thrombosis occurred at birth when Andrew's mother's uterus ruptured, causing asphyxia, but that "[t]he effects of the thrombosis were silent during the immediate newborn period."[5] Dr. Karotkin said that Dr. Kerkering noted

---

[5] On brief, claimant cites an article from the July 5, 2001 issue of The New England Journal of Medicine as supporting Dr. Karotkin's opinion regarding the effect of uterine rupture

- 19 -

fetal bradycardia immediately prior to removal of the fetal heart monitor, and Dr. Karotkin testified that this episode of bradycardia "would indicate that the fetus was in some jeopardy due to a possible decrease of blood supply and oxygen to the fetus." However, as the commission noted, Dr. Karotkin admitted on cross-examination that no objective evidence in the record, other than the thrombosis itself, suggested an episode of hypotension or bradycardia in the baby during delivery. Dr. Herbert, writing for the panel of physicians involved pursuant to Code § 38.2-5008(B), confirmed that "[t]he fetal heart rate tracing prior to delivery was normal." Thus, the evidence supports the conclusion that Dr. Kerkering erred when she noted Andrew experienced an episode of fetal bradycardia immediately prior to removal of the fetal heart monitor and that Dr. Karotkin attempted to rely on this error, despite his knowledge that no objective evidence in the record, other than the occurrence of the thrombosis itself, suggested an episode of hypotension or bradycardia in the baby. Accordingly, the record supports the commission's conclusion that Dr. Karotkin's opinion

on a fetus. Although this article was published before the commission's issuance of its review opinion on July 26, 2001, the record contains no indication that claimant submitted the article to the commission for its consideration prior to the commission's issuance of its decision or asked the commission, after the issuance of its decision, to reconsider based on the article. We are unable to consider evidence offered for the first time on appeal.

was inconsistent and unpersuasive and that claimant's evidence established, at most, the possibility rather than probability that an oxygen deprivation caused Andrew's thrombosis.[6]

Furthermore, as the commission noted, the other medical experts opined that Andrew suffered no injury at birth and that the thrombosis resulted from dehydration which occurred after Andrew's release from the hospital.[7]  Drs. Kerkering, Morton and

_____

[6] Claimant effectively conceded this point when he argued on brief that "the uterine rupture is a non-excludable cause of [Andrew's] condition due to lack of objective evidence as to fetal distress in the medical records which would have been evidenced by fetal heart tracings and arterial blood gas readings."  Claimant complains that his claim should not be denied due to a lack of objective evidence of fetal distress because fetal heart tracings and arterial blood gas readings which could have confirmed fetal oxygen deprivation were not obtained.  However, the statutory scheme places the burden of proving oxygen deprivation on the claimant, and no evidence establishes that this lack of evidence resulted from negligence or intentional behavior on the part of any treating physician.  Claimant concedes the fetal heart monitor was disconnected to permit the emergency cesarean section, and the panel opined that Andrew's "vigorous condition" at birth "may well have been deemed adequate to verify his immediate condition" without obtaining "an umbilical cord pH."

[7] Citing Code § 8.01-401.3 and a similar federal evidentiary rule, claimant argues that the program's medical evidence did not sufficiently exclude oxygen deprivation as a probable cause of his injury.  However, Code § 8.01-401.3 relates to the admissibility of expert testimony which "will assist the trier of fact to understand the evidence or to determine a fact in issue."  That code section does not deal with the sufficiency of expert testimony to prove a fact in issue.  On appeal, claimant's only challenge to the admissibility of this evidence relates to the timeliness of its filing.  His primary argument deals with the sufficiency of the expert opinions rather than their admissibility.  Thus, Code § 8.01-401.3 and any cases interpreting it or its federal counterpart are irrelevant in this appeal.

Taylor, as well as the panel physicians, all pointed to Andrew's condition at birth, including his good APGAR scores and the lack of any "significant neurological problem in the immediate time frame after birth," as strong evidence that he suffered no lasting negative effects from the delivery process. The record also established that venous sinus thrombosis is caused by any of six conditions, including dehydration, asphyxia, infection, hyperviscosity, hypercoagulopathy, and trauma, but that severe dehydration is the most common cause. Drs. Kerkering, Morton and Taylor, as well as the panel physicians, opined that claimant was dehydrated when readmitted to the hospital, and all opined that Andrew suffered from no other precipitating condition. Thus, the record also supports the commission's findings that the evidence established dehydration and that this dehydration was the most likely cause of claimant's injury.

For these reasons, we hold the record supports the commission's finding that claimant failed to prove his condition was a birth-related neurological injury as defined in Code § 38.2-5001. Therefore, we affirm the commission's denial of benefits.

Affirmed.